## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**CURRY MANAGEMENT CORP.,**

      **Plaintiff,**

  **-against-**

**EMPLOYEE BENEFIT SOLUTIONS, LLC; ANTHONY RICCARDI; and PATRICIA RICCARDI,**

      **Defendants.**

**Case No.**

## COMPLAINT

Plaintiff Curry Management Corp. ("Curry" or "Plaintiff"), by its undersigned attorneys, as and for its complaint against defendants Employee Benefit Solutions, LLC ("EBS"); Anthony Riccardi ("Anthony"); and Patricia Riccardi ("Patricia," and collectively with Anthony, the "Riccardis," and collectively with EBS and Anthony, the "Defendants") for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001 *et seq.*; breach of contract; specific performance; turn over of the Unsubmitted Claims (as defined herein); unjust enrichment; conversion; fraud; negligent misrepresentation; common law breach of fiduciary duty; civil conspiracy; and a judgment piercing the corporate veil and holding the Riccardis liable for EBS's malfeasance, alleges as follows:

## JURISDICTION AND VENUE

1.  The action arises under ERISA, federal common law applicable to employee benefit plans governed by ERISA, and supplemental state law.  This Court has jurisdiction under 28 U.S.C. §§1331 and 1367, and 29 U.S.C. §1132.

2.     Venue in this district is proper because the Plan (as defined herein) is sponsored and administered in this District, and the Defendants have breached their fiduciary duties and engaged in other wrongdoing, as further described herein, in this District.

## NATURE OF THE ACTION

3.     For many years, and pursuant to a number of contracts between EBS and Curry, EBS acted as Curry's third-party administrator with respect to Curry's provision of self-insured medical benefits to employees of Curry.  In connection therewith, Curry transferred millions of dollars to EBS in order to fund the payment of medical claims incurred by and submitted to EBS by Curry's employees, and to pay the insurance premiums of stop-loss insurance policies, which insurance coverage EBS was responsible for obtaining on Curry's behalf.

4.     Despite working with Curry for many years, it became apparent in 2019 that EBS failed to undertake many of the responsibilities for which it was contractually obligated.  Similarly, it became apparent that EBS and the Riccardis failed to undertake many of their fiduciary responsibilities under ERISA.

5.     In addition to failing to comply with their contractual obligations and fiduciary duties under ERISA, EBS engaged in significant malfeasance, including without limitation stealing substantial amounts of money from Curry and/or the Plan, failing to submit numerous claims to Curry's stop-loss insurers, setting up phony email accounts and correspondence from non-existent "employees" who did not work for Curry's stop-loss insurers, forging the signatures or one or more employee of Curry, producing months of phony bank account statements to Curry, and creating bogus checks, which EBS made appear to have been issued by Curry's stop-loss insurers, but were, in fact, fraudulent.

2

6.     Upon information and belief, the Riccardis, as owners and/or principals of EBS, committed, and intentionally and willfully conspired with and participated in, EBS's malfeasance from at least 2017 through 2019.

7.     As a result of the Defendants' nefarious and fraudulent conduct, Curry has suffered millions of dollars of damages and is unable to submit a substantial number of medical claims to its stop-loss insurers because of Defendants' wrongful retention of medical claims information submitted to EBS by Curry's employees.

8.     Upon information and belief, EBS, Anthony, and/or Patricia are under investigation by such government authorities as the United States Attorney for the Southern District of New York, the United States Attorney for the District of Connecticut, the United States Department of Labor, and the Internal Revenue Service as a result of their conduct, including, in part, the conduct alleged herein.

<u>**THE PARTIES**</u>

9.     Plaintiff Curry is a corporation organized under the laws of the State of New York with a principal place of business located in Westchester County, New York.  Curry is an automobile dealership management company with dealerships located in Westchester County and elsewhere (as used hereinafter, "<u>Curry</u>" includes the dealerships).  Curry maintains a self-funded employee medical plan, the Curry Management Corp. Employee Health Plan (the "<u>Plan</u>"), covering certain of Curry's employees' medical expenses.

10.     Defendant EBS is, upon information and belief, a limited liability company organized and existing under the laws of the State of Connecticut with a principal place of business located at 47 Old Ridgefield Road, Wilton, Connecticut 06897.  EBS is and/or was in the business

of providing employee benefit claims administration services, and acted as the third-party administrator ("TPA") of the Plan at all relevant times.

11.    Defendant Anthony is, upon information and belief, an owner, principal, and/or officer of defendant EBS and resides in New Canaan, Connecticut.  At all relevant times, Anthony exercised discretionary authority and control regarding management of the Plan and its assets, and he had discretionary authority and responsibility in administering the Plan.

12.    Patricia, upon information and belief, is the wife of Anthony, resides in New Canaan, Connecticut, and is an owner, principal, and/or officer of EBS.  Patricia executed at least one of the Administration Contracts (as defined herein) on behalf of EBS.  At all relevant times, Patricia exercised discretionary authority and control regarding management of the Plan and its assets, and she had discretionary authority and responsibility in administering the Plan.

## FACTUAL ALLEGATIONS

**A.    The Plan, The Administration Contracts, And The Parties' Relationship**

13.    Curry established the Plan for the purpose of providing medical insurance to certain of its employees.  At all relevant times, the Plan operated as an employer welfare benefit plan within the meaning of ERISA.  Further, at all relevant times, the Defendants acted as fiduciaries of the Plan within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21).

14.    Over the course of more than fifteen years, Curry and EBS entered into a series of Administration Contracts (each an "Administration Contract," and collectively, the "Administration Contracts"), whereby EBS served as the TPA for the Plan.

15.    At all relevant times, as owners and persons in control of EBS, the Riccardis exercised discretionary authority and control regarding the administration and management of the Plan and its assets, and they had discretionary authority and responsibility with respect to the Plan.

16.    Pursuant to the Administration Contracts, EBS was required, among other things, to administer the Plan's claims procedures, including reviewing medical insurance claims submitted by Curry employees and making payment of such claims, procuring stop-loss insurance coverage on behalf of Curry, preparing checks for payment of approved medical claims, and forwarding claims payments to Curry, Curry's employees, or a health care provider.

17.    Likewise, pursuant to the Administration Contracts, Curry provided for the payment of medical claims under the Plan by depositing funds into a bank account in EBS's name in accordance with funding instructions from EBS, which accounts were managed exclusively by EBS.

18.    In light of the parties' agreement and the long-standing relationship between EBS and Curry, EBS (and not Curry) was the sole contact with the insurance companies that provided aggregate and individual/specific stop-loss coverage to Curry with respect to Curry's Plan expenditures.

19.    In accordance with its contractual obligations and to effectuate the administration of the Plan, between 2017 and 2019, Curry transferred millions of dollars to checking accounts maintained by EBS for the specific purpose of: (i) funding the payment of its employees' medical claims incurred and submitted to EBS for payment; (ii) paying the stop-loss insurers' premiums; and (iii) paying the administrative fees charged by EBS to Curry.

20.    In or around 2019, it became apparent that EBS had failed to undertake many of its contractual responsibilities under the Administration Contracts, without prior notice to Curry. Likewise, it became apparent that EBS and the Riccardis had failed to undertake many of their fiduciary responsibilities in connection with the Plan.

21.     Curry further became aware that not only did the Defendants breach their fiduciary and/or contractual obligations to Curry, but the Defendants engaged in a scheme to defraud Curry out of millions of dollars.

**B.    The Defendants' Malfeasance With Respect To 2017**

22.     EBS procured an insurance policy from Zurich American Insurance Company ("Zurich") to provide Curry with stop-loss insurance for calendar year 2017.

23.     However, EBS procured a stop-loss insurance policy from Zurich for 2017: (i) with only a $1,000,000.00 limit, instead of the $2,000,000.00 limit that Curry requested; (ii) that does not include prescription drug coverage as part of the aggregate coverage, despite Curry's request for prescription drug coverage; and (iii) that excludes coverage of Curry's Executive Medical Plan, despite Curry's request for coverage thereof.

24.     Upon information and belief, EBS intentionally procured lesser, less expensive coverage than Curry requested so that EBS and/or the Riccardis could pocket the difference between the actual premium and the higher premium that would have been charged for the greater level of coverage.

25.     In order to achieve the theft described in paragraph 24, above, EBS advised Curry to forward to EBS the higher amount of money for the supposed purchase of the greater level of coverage and EBS then forwarded the lesser amount of money to Zurich and retained the difference.

26.     In 2017, Curry employees submitted medical insurance claims to EBS in the total amount of $7,080,368.20, all of which claims EBS was required to submit to Zurich.

27.     However, EBS submitted only $3,736,820.52 in claims to Zurich in 2017, and, accordingly, failed to submit claims totaling $3,343,547.68 to Zurich.

28.     Pursuant to an audit of EBS's claims processing practices conducted by Northshore International Insurance Services, Inc. at the behest of Spectrum Underwriting Managers, Inc. ("Spectrum"), an agent of Zurich, EBS was requested to provide information to Spectrum with respect to 125 medical claims by employees of Curry totaling $860,921.64, which information was needed to determine whether those claims are subject to reimbursement to Curry by Zurich.

29.     However, EBS has failed and refused to provide the required information to Spectrum, thereby precluding Spectrum and Zurich from approving such claims.

30.     Additionally, rather than paying $580,912.86 in insurance premiums to Zurich as required by the Administration Contract in 2017, EBS paid Zurich only $490,664.76, resulting in $90,248.10 in underpayment of premiums.

31.     Upon information and belief, EBS stole that $90,248.10.

32.     Curry has demanded that EBS provide all information underlying all of Curry employees' 2017 medical claims to Curry and/or the third-party administrator which Curry engaged to replace EBS in November 2019, but EBS has failed and refused to provide this information to Curry or to Curry's new third-party administrator.

C.      **The Defendants' Malfeasance With Respect To 2018**

33.     EBS procured an insurance policy from Partners/U.S. Fire Insurance Company ("Partners") to provide Curry with stop-loss insurance for the calendar year 2018.

34.     For 2018, Curry, at EBS's instructions, funded check registers to pay what were purported Curry's employees' medical insurance claims, in the total amount of approximately $7,720,000.00, of which individual claims comprised $3,015,765.98.

35.     However, EBS submitted only $1,435,256.59 in individual claims to Partners and failed to submit any aggregate claims to Partners in 2018, leaving millions of dollars of claims unsubmitted.

36.     In 2018 (and into early 2019), Partners sent EBS twenty-six checks made payable to "Curry Corporation," which collectively amounted to $1,435,256.59, in reimbursement of a portion of the individual claims submitted by Curry employees in 2018, which checks should have been provided to Curry by EBS.

37.     However, despite Curry's repeated requests in 2019 and 2020, EBS failed to remit the $1,435,256.59 to Curry and, upon information and belief, EBS and/or the Riccardis stole, converted, or otherwise remains in possession of those funds.

38.     Curry has requested that EBS provide all information underlying all of Curry's employees' 2018 medical claims to Curry and the whereabouts of the $1,435,256.59 intended for Curry, but EBS has failed and refused to provide this information to Curry.

**D.     The Defendants' Malfeasance With Respect To 2019**

**i.     *Theft of Ethos/Chubb Insurance Premiums***

39.     EBS procured an insurance policy from Ethos/Chubb Insurance ("Ethos") to provide Curry with stop-loss insurance for the calendar year 2019.

40.     In connection therewith, Curry transferred $466,032.31 to EBS for the specific purpose of paying for the Ethos insurance.

41.     Upon information and belief, EBS remitted only approximately $90,000.00 of the $466,032.31 to Ethos, and EBS and/or the Riccardis stole the remainder.

42.     As a result, Ethos cancelled said insurance policy for the reason of non-payment of premium, leaving Curry without stop-loss insurance for 2019.

43.     Curry has demanded that EBS provide all information regarding Curry's transfer of $466,032.31 to EBS and that EBS take steps to reinstate the Ethos policy, but EBS has failed and refused to provide any such information to Curry or reinstate the Ethos policy.

44.     Upon information and belief, the $466,032.31 amount referred to in paragraph 43, above, was never remitted to Ethos and the insurance policy was never reinstated.

45.     As a result of EBS' malfeasance, Curry terminated the applicable Administration Contract and its relationship with EBS effective December 1, 2019.

*ii.*     ***Theft of Monies from Citibank, N.A. Accounts***

46.     Commencing in June 2019, Curry periodically funded a bank account at Citibank, N.A. in accordance with specific instructions from EBS, in order to enable EBS to pay medical claims of certain of Curry's employees; EBS utilized that Citibank Account and one other Citibank account to pay Curry's employees' medical claims (the "Citibank Accounts").

47.     EBS provided Curry with purported copies of monthly statements (the "Phony Statements") for the Citibank Accounts, which Phony Statements EBS, upon information and belief, created and forged with full knowledge of their falsity.

48.     According to the Phony Statements, the Citibank Accounts had a combined balance of $320,184.06 as of November 30, 2019.

49.     However, Curry has since discovered that EBS and/or the Riccardis engaged in improper conduct with respect to Curry and the Citibank Accounts, including creating phony statements (i.e., the Phony Statements) for the Citibank Accounts, which Phony Statements were provided to Curry by EBS, and the theft of a significant, yet undetermined, amount of money from the Citibank Accounts.

50.     After obtaining actual monthly statements for the Citibank Accounts directly from Citibank, N.A., the collective balance of the Citibank Accounts as of September 30, 2019 was only $15,826.80 – $304,357.26 less than reflected in the Phony Statements.

51.     Upon information and belief, between June 2019 and February 2020, EBS and/or the Riccardis stole, converted, or otherwise remain in possession of no less than $304,357.26 from the Citibank Accounts, as well as substantial other monies not reflected in the September 2019 Citibank Account statements, which monies Curry expects to quantify as its investigation continues.

## CAUSES OF ACTION

### COUNT I
**(Breach of Fiduciary Duty Under ERISA Against the Defendants)**

52.     Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

53.     The Defendants were each fiduciaries of the Plan within the meaning of ERISA, including without limitation as a result of the discretionary authority they exercised with respect to the administration and assets of the Plan.

54.     Curry reasonably relied upon the Defendants to administer the Plan with the utmost duty, loyalty, and care, as is required from a fiduciary of an employee benefit plan, such as the Defendants.

55.     The Defendants have breached their fiduciary responsibilities and duties under ERISA in at least the following respects:

(a)     They, maliciously, imprudently, and in their own interests, misappropriated and converted millions of dollars that were to be used for, among other things, the

payment of medical claims that were submitted to EBS by employees of Curry, and the payment of insurance premiums;

(b)     They failed to submit millions of dollars in medical claims to Curry's stop-loss insurers; and

(c)     They engaged in improper conduct with respect to Curry and assets of the Plan, including the Citibank Accounts, and stolen a significant, yet undetermined, amount of Plan assets.

56.     As a result of the Defendants' breach of fiduciary duties, Curry has suffered millions of dollars in damages, in an amount to be proven at trial.

**WHEREFORE**, on Count I, Curry seeks a monetary judgment against the Defendants, jointly and severally, in an amount to be proven at trial, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry; (b) post-judgment interest at the applicable rates; and (c) such other and further relief as the Court may deem just, proper, and equitable

## COUNT II
### (Breach of the Administration Contracts Against EBS)

57.     Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

58.     The Administration Contracts are valid and binding contracts between EBS and Curry.

59.     As set forth above, EBS breached the Administration Contracts by, among other things, failing and refusing to submit all of Curry's employees' medical claims to the applicable stop-loss insurer; failing to pay certain insurance premiums to Curry's stop-loss insurers; failing to provide necessary information to Curry's various stop-loss insurers to enable them to make reimbursement to Curry under the stop-loss insurance policies; failing to remit to Curry funds

11

provided to EBS for Curry's benefit; failing to procure stop-loss insurance, sufficient stop-loss insurance, and/or the type and level of stop-loss insurance that Curry requested that EBS procure; and failing to provide information regarding the Plan (including without limitation claims information), as requested by Curry.

60.     Curry has performed and continues to perform all of its obligations under the Administration Contracts.

61.     The Administration Contracts provide for the recovery by Curry of its attorneys' fees and costs in connection with pursuing its rights and remedies under the Administration Contracts.

62.     As a result of EBS's breaches of the Administration Contracts, Curry has suffered millions of dollars in damages, in a specific amount to be proven at trial, in additional to attorneys' fees and costs.

**WHEREFORE**, on Count II, Curry seeks a monetary judgment against the Defendants, jointly and severally, in an amount to be proven at trial, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry; (b) post-judgment interest at the applicable rates; and (c) such other and further relief as the Court may deem just, proper, and equitable.

<u>**COUNT III**</u>
**(Specific Performance of the Administration Contracts Against EBS)**

63.     Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

64.     The Administration Contracts are valid and binding contracts between EBS and Curry.

65.     As set forth at length herein, *supra*, in accordance with the Administration Contracts, Curry's employees submitted millions of dollars of medical claims to EBS, which EBS was required to submit to Curry's stop-loss insurers.

66.     However, EBS failed to submit approximately $9,628,291.09 of such claims to Curry's stop-loss insurers in 2017 and 2018 (Zurich and Partners, respectively) (the "Unsubmitted Claims").

67.     In addition, despite Spectrum's request to EBS, EBS failed to provide information to Spectrum regarding $860,921.64 of claims that had been submitted to Zurich, thereby preventing Zurich from approving such claims.

68.     Section IV of the Administration Contracts requires EBS to turn over to Curry copies of EBS's records upon termination of the Administration Contracts.

69.     Curry terminated the Administration Contracts due to EBS's malfeasance, among other reasons.

70.     Curry demanded that EBS surrender and turn over to Curry the Unsubmitted Claims and information relating thereto in accordance with the Administration Contracts.

71.     However, to date, EBS has failed and refused to surrender and turn over to Curry the Unsubmitted Claims and information relating thereto, despite being in exclusive possession of same.

72.     Curry is not in possession of and does not have access to any copies or duplicates of the Unsubmitted Claims or the information underlying the Unsubmitted Claims.

73.     Curry seeks specific performance of the Administration Contracts, requiring EBS to immediately turn over the Unsubmitted Claims and all underlying information to Curry so that Curry can timely submit same to its stop-loss insurers.

74.     Absent an order directing the immediate turnover of the Unsubmitted Claims, Curry is without an adequate remedy at law.

75.     Curry has performed and continues to perform all of its obligations under the Administration Contracts.

76.     The Administration Contracts provide for the recovery of Curry's attorneys' fees and costs in connection with pursuing its rights and remedies under the Administration Contracts.

**WHEREFORE**, on Count III, Curry seeks a declaratory judgment directing that EBS immediately comply with its contractual obligations and turn over the Unsubmitted Claims to Curry, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry; (b) post-judgment interest at the applicable rates; and (c) for such other and further relief as the Court may deem just, proper, and equitable.

<u>**COUNT IV**</u>
**(Turnover of the Unsubmitted Claims Against the Defendants)**

77.     Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

78.     Curry is the owner of the Unsubmitted Claims and the information underlying the Unsubmitted Claims.

79.     EBS breached its contractual obligations under the Administration Contracts by failing and refusing to submit the Unsubmitted Claims to Curry's insurers.

80.     Further, EBS breached its contractual obligations by failing and refusing to turn over the Unsubmitted Claims and the information underlying them upon termination of the Administration Contracts and Curry's demand for same.

81.     Accordingly, the Defendants are wrongfully withholding the Unsubmitted Claims and the underlying information from Curry.

14

82.     The Unsubmitted Claims remain in the possession of the Defendants and, upon information and belief, are located at 47 Old Ridgefield Road, Wilton, Connecticut 06897.

83.     Upon information and belief, the value of the Unsubmitted Claims is no less than $9,628,291.09.

84.     Because EBS breached its contractual obligations by failing and refusing to submit the Unsubmitted Claims to Curry's insurers and failing to provide the Unsubmitted Claims to Curry upon demand, Curry is entitled immediate possession of the Unsubmitted Claims.

85.     Curry has demanded that the Defendants voluntarily turn over the Unsubmitted Claims to Curry.

86.     Despite due demand, the Defendants have failed and refused to do so.

87.     Without an order for turnover, the Defendants will remain in possession of the Unsubmitted Claims, and may conceal and/or transfer, or dispose of the Unsubmitted Claims.

88.     Further, the deadlines to submit many of the Unsubmitted Claims to Curry's insurers are rapidly approaching, as early as June 2020.  Absent an Order from this Court, Curry will not be able to obtain the Unsubmitted Claims from EBS and timely submit same to its stop-loss insurers, thereby further damaging Curry and leaving Curry with no ability to submit its employees' medical claims to Curry's stop-loss insurers

89.     Upon information and belief, the Defendants have no defenses to Curry's claim with respect to turn over of the Unsubmitted Claims.

90.     By reason of the foregoing, Curry has been damaged and is entitled to an order and judgment of this Court granting Curry immediate possession of the Unsubmitted Claims and for an order that the Defendants immediately deliver possession of the Unsubmitted Claims and all underlying information directly to Curry.

**WHEREFORE**, on Count IV, Curry respectfully requests an order and judgment (i) of seizure and turnover pursuant to CPLR § 7102 regarding the Unsubmitted Claims, directing that the Defendants immediately turn over the Unsubmitted Claims and underlying information to Curry; and (ii) for such other and further relief as the Court may deem just, proper, and equitable.

**COUNT V**
**(Unjust Enrichment Against EBS)**

91.     Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

92.     As set forth at length herein, EBS has been unjustly enriched by receipt and retention of, among other things: (i) $1,435,256.59 of funds made payable to Curry by Partners as reimbursement of a portion of the individual medical claims submitted to EBS by Curry employees, and paid by Curry, in 2018; (ii) $90,248.10 provided to EBS by Curry for stop loss insurance in 2017 which was never paid to Zurich by EBS; (iii) $466,032.31 provided to EBS by Curry for Ethos stop-loss insurance in 2019, of which only approximately $90,000.00 was paid to Ethos by EBS; and (iv) no less than $304,357.26 of funds stolen or otherwise improperly removed from the Citibank Accounts by EBS (which figure is expected to increase substantially as Curry's investigation continues).

93.     By reason of the foregoing, EBS has been enriched at Curry's expense.

94.     Equity and good conscience do not permit EBS to retain such monies.

95.     By reason of the foregoing, Curry has been damaged and is entitled to recover from EBS a sum of not less than $2,205,894.26.

**WHEREFORE**, on Count V, Curry seeks a monetary judgment against the Defendants, jointly and severally, in an among to be proven at trial, but no less than $2,205,894.26, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry; (b) post-judgment interest

at the applicable rates; and (c) such other and further relief as the Court may deem just, proper, and equitable.

## COUNT VI
### (Conversion Against EBS)

96.     Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

97.     Curry has an interest in, among other things: (i) $1,435,256.59 of funds made payable to Curry by Partners as reimbursement of a portion of the individual medical claims submitted to EBS by Curry employees, and paid by Curry, in 2018; (ii) $90,248.10 paid to EBS by Curry for stop loss insurance in 2017, which was never paid to Zurich by EBS; (iii) $376,032.31 paid to EBS by Curry for stop loss insurance in 2019, which was never paid to Ethos, Curry's stop loss insurer in 2019; (iv) no less than $304,357.26 of funds that were stolen or otherwise improperly removed from the Citibank Accounts by EBS (which figure is expected to increase substantially as Curry's investigation progresses); and (v) medical claims information submitted to EBS by Curry's employees, including the Unsubmitted Claims.

98.     In derogation of Curry's rights in said funds and information, the Defendants are exercising dominion over said funds and said claims information.

99.     By reason of the foregoing, Curry has been damaged and is entitled to the return of no less than the $2,205,894.26 and the claims information from the Defendants.

**WHEREFORE**, on Count VI, Curry seeks a declaratory judgment that the Defendants must immediate turn over the Unsubmitted Claims to Curry, as well as other medical claims information demanded by Curry, and a monetary against the Defendants, jointly and severally, in an amount to be proven at trial, but not less than $2,205,894.26, in addition to (a) all costs and

attorneys' fees incurred and to be incurred by Curry; (b) post-judgment interest at the applicable rates; and (c) for such other and further relief as the Court may deem just, proper, and equitable.

## COUNT VII
### (Fraud Against EBS)

100.    Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

101.    Among numerous other misrepresentations, EBS knowingly misrepresented to Curry that it would: (i) use the aforementioned $90,248.10 paid to EBS by Curry to procure stop loss insurance in 2017; (ii) use the aforementioned $466,032.31 paid to EBS by Curry to procure stop loss insurance in 2019; (iii) turn over to Curry $1,435,256.59 in funds made payable to Curry by Partners as reimbursement of a portion of the individual claims submitted by Curry employees in 2018 to EBS; and (iv) properly manage the Citibank Accounts, including that certain funds provided by Curry, at EBS' direction for the specific purpose of the payment of certain Curry employees' medical claims, were available in the Citibank Accounts.

102.    In furtherance of this fraudulent scheme, the Defendants knowingly concealed from Curry that such funds were not used and/or available as promised.

103.    In an effort to cover up its fraudulent scheme, EBS, among other things, went so far as to create the Phony Statements and provide same to Curry on a monthly basis.

104.    In a further effort to cover up its fraudulent scheme, when Curry requested information regarding said funds, EBS failed and refused to provide such information.

105.    In fact, to date, EBS has still failed to provide information regarding said funds and Curry has no information regarding the location of said funds.

106.    These misrepresentations and omissions were knowingly false and made with the intent to deceive Curry into continuing to work with EBS and provide funds to EBS to permit it to administer the Plan.

107.    Curry justifiably relied on EBS's fraudulent misrepresentations.

108.    As a result of EBS's fraudulent misrepresentations, Curry has suffered millions of dollars in damages, in a specific amount to be proven at trial, exclusive of attorneys' fees and punitive damages.

109.    In addition, due to EBS's egregious fraudulent conduct, Curry seeks punitive damages to punish EBS and deter it from engaging in such fraudulent conduct in the future.

**WHEREFORE**, on Count VII, Curry seeks a monetary against the Defendants, jointly and severally, in an amount to be proven at trial, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry; (b) punitive damages; (c) post-judgment interest at the applicable rates, and (d) for such other and further relief as the Court may deem just, proper, and equitable.

<u>COUNT VIII</u>
**(Negligent Misrepresentation Against EBS)**

110.    Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

111.    EBS made material misrepresentations of fact to Curry; particularly, that it would: (i) use the aforementioned $90,248.10 paid to EBS by Curry to procure stop loss insurance in 2017; (ii) use the aforementioned $466,032.31 paid to EBS by Curry to procure stop loss insurance in 2019; (iii) turn over to Curry $1,435,256.59 in funds made payable to Curry by Partners as reimbursement of a portion of the individual claims submitted by Curry employees in 2018; and (iv) properly manage the Citibank Accounts, including that certain funds provided by Curry at

EBS' direction for the specific purpose of the payment of certain Curry employees' medical claims were available in the Citibank Accounts.

112.    EBS knew that the representations were false as made, and EBS had no reasonable grounds to believe such misrepresentations were true.

113.    EBS made these misrepresentations with the intent that Curry rely on them.

114.    Curry justifiably relied on EBS's misrepresentations.

115.    As a result of EBS's fraudulent misrepresentations, Curry has suffered millions of dollars in damages, in a specific amount to be proven at trial.

**WHEREFORE**, on Count VIII, Curry seeks a monetary against the Defendants, jointly and severally, in an amount to be proven at trial, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry; (b) post-judgment interest at the applicable rates; and (c) for such other and further relief as the Court may deem just, proper, and equitable.

<u>**COUNT IX**</u>
**(Common Law Breach of Fiduciary Duty Against EBS)**

116.    Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

117.    As TPA of the Plan, EBS owed a fiduciary duty to Curry and to the Plan under ERISA.

118.    Curry reasonably relied upon EBS to administer the Plan with the utmost duty, loyalty, and care.

119.    EBS grossly, outrageously, and maliciously breached the fiduciary duty it owed to Curry by, among other things, misappropriating and converting millions of dollars that were to be used for, among other things, the payment of submitted claims and the payment of stop-loss

insurance premiums, and by failing to submit millions of dollars in medical claims to Curry's stop-loss insurers.

120.    As a result of EBS's breach of fiduciary duty, Curry has suffered millions of dollars in damages, in a specific amount to be proven at trial.

**WHEREFORE**, on Count IX, Curry seeks a monetary against the Defendants, jointly and severally, in an amount to be proven at trial, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry, (b) post-judgment interest at the applicable rates, (c) punitive damages; and (d) for such other and further relief as the Court may deem just, proper, and equitable.

<u>**COUNT X**</u>
**(Civil Conspiracy Against All Defendants)**

121.    Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

122.    As set forth at length herein, EBS engaged in fraud and conversion to the detriment of Curry.

123.    The Riccardis, as the principals and owners of EBS, conspired and acted in concert with EBS to perpetuate the fraudulent scheme described herein and defrauded Curry out of millions of dollars.

124.    EBS and the Riccardis intentionally and willfully participated in this fraudulent scheme from at least 2017 through 2019.

125.    As a result of their fraudulent scheme, Curry has suffered millions of dollars in damages, in a specific amount to be proven at trial.

126.    In addition to compensatory damages, Curry seeks punitive damages to punish the Defendants and deter them from engaging in such fraudulent conduct in the future.

**WHEREFORE**, on Count X, Curry seeks a monetary against, jointly and severally, the Defendants in an amount to be proven at trial, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry, (b) post-judgment interest at the applicable rates, (c) punitive damages; and (d) for such other and further relief as the Court may deem just, proper, and equitable.

## COUNT XI
### (For Judgment Against the Riccardis Piercing the Corporate Veil and Holding the Riccardis Liable for EBS's Malfeasance)

127.    Curry repeats and realleges each of the foregoing allegations as if fully set forth herein.

128.    The Riccardis, at all relevant times, were and are the owners, principals, and/or officers of EBS and were and are responsible for the day-to-day activities of EBS.

129.    In this capacity, upon information and belief, the Riccardis controlled EBS and utilized EBS for their own personal benefit to perpetrate fraud, accomplish injustice, and circumvent the law, all to the detriment of EBS's creditors, including to the detriment of Curry.

130.    Upon information and belief, the Riccardis used EBS to perpetuate a fraud and defeat the ends of justice by funneling monies through EBS to themselves for their own personal benefit to the detriment of EBS's creditors, including Curry.

131.    In addition, upon information and belief, EBS failed to observe corporation formalities, including, upon information and belief, non-functioning of other officers or directors and the absence of corporate records.

132.    In addition, upon information and belief, EBS is undercapitalized and there is an overlap in ownership and personnel.

133.    Based on the foregoing, this Court should pierce the corporate veil and hold the Riccardis individually and in their personal capacity fully liable for EBS's fraud and malfeasance.

**WHEREFORE,** on Count XI, Curry seeks a declaratory judgment piercing the corporate veil and holding the Riccardis liable for EBS's malfeasance, in addition to (a) all costs and attorneys' fees incurred and to be incurred by Curry; (b) punitive damages; (c) post-judgment interest at the applicable rates, and (d) for such other and further relief as the Court may deem just, proper, and equitable.

Dated: June 30, 2020                    VEDDER PRICE P.C.


                                By */s/ Jonathan Wexler*_____
                                    Jonathan Wexler
                                    Fleming L. Ware
                                    1633 Broadway, 31st Floor
                                    New York, New York  10019
                                    Telephone:  (212) 407-7700
                                    Facsimile:  (212) 407-7799
                                    jwexler@vedderprice.com

                                    *Attorneys for plaintiff Curry Management Corporation*